Final case this morning is Integrated Advertising Labs v. Revcontent, 2023-1392. May it please the Court. Good morning, Mr. Kimball. Please proceed. May it please the Court. Again, Justin Kimball on behalf of the Appellant Integrated Advertising Labs. This is an interesting case because the technology here is something that we all interact with every day that we're online. Every day that we go to any website, we interact with advertisements, obviously, and the way that we interact with those today is much different than the way that we would have interacted with those at the time that these patents were filed for back in 2006 and 2007. A lot of what we interact with every day constitutes abstract ideas. Yes, sir. That's right. And so to the extent that these patent claims were directed to targeted advertising alone, we wouldn't be here making this argument. But the patent claims aren't. And so that is instead, it's an improvement to a system that can automatically deliver and distribute and display advertisements on many websites automatically, and in particular, advertisements that are contiguous with other website content and share similar features with that content. That type of advertising, the one I was describing today, is known today as native advertising. And so most of the claim limitations... claim limitations say electronically receiving, distributing, receiving, posting. Isn't this just extrinsic data? It's certainly done electronically, and it is data. However, what these patents do is they provide steps and methods that did not exist before. And if you look at claim... Counsel, so when something doesn't exist before, that doesn't make it any less abstract, right? Not necessarily. That's right. What do you think is the inventive concept or the thing that you're arguing makes this non-abstract because it's, say, a technological solution to a technological problem? What specific things are in this claim? Your Honor, yes. So I'd answer it two ways. So what I would say is I do think that it is an improvement to networking in regard to advertisements, and I think specifically it's the way that these advertisements are distributed automatically to many websites and the way that they are displayed within those websites. That was a heavy lift. And really, just to skip down, you know, this... in a way that they are contiguous with other content that the user actually requested. Right. So at the time, and this is discussed in the patent, you had these static banner advertisements, they're called. So these were one-off images that would be created for a given website. And so if that ad, you know, wasn't working or whatever, you would have to redo that, resubmit that image to that website. What our patents are about is about creating dynamic advertisements. So, one, they didn't have to be images. They could be, and we talked about this, multiple components, videos and whatnot. But that they could be done automatically across websites and seamlessly fit within the rest of the content. We show in our briefs images from... But what technological problem? I mean, to be honest with you, let's say, okay, so there's an idea, and I'm going to make it so my advertisements are seamless. So they don't look as much as advertisements, right? But why is that any different than the conventional displaying of content that the user asked for? In other words, there doesn't seem... it seems more like an idea and not a technological improvement of either software or hardware or anything else. How is it a technological improvement? So this goes back to what I was saying that, to your point, say a customer prior to the patents said they want something different. Request, it's developed and transmitted to the customer some way. What we are doing is being able to do this on a much larger scale and not just in a binary one-to-one way. You ask for something, we redo a custom website and send it back to you. These ads are submitted dynamically, and so the technological improvement has to do with the systems that are described in the patent, the distributor module, the press release coaster module, and others, and how those are used to intake this information and distribute it out to these websites and then fit it into those websites in a way that is seamless, matches the look and feel of the website. How is it different than the way systems would distribute other kinds of content? Your Honor, I'm not sure I've considered that question. I suppose the answer would depend on what that type of content is. I would say that, I don't know exactly what the answer to that is. I suppose the answer is other kind of content, let's take for example an article, that's pushed out to CNN. I raise that because that's one of the pirate references that we got over. So that would be done, and then you could, I suppose, edit and send back a different article, or just the next day's article, or something like that. Here still, I think the answer to your question is around who are the players there. So in that example that I'm coming up with, you have, I guess, an author or creator of that, sending it to the publisher. Here we have more players. We have these advertisers. We have publishers. We have companies like RevContent and Nativo, which developed the patents, which provide these systems that take in these advertisements and these requirements and feed them across the Internet, across multiple websites. So I do think it's different, and I would say getting to, I've been kind of talking around really what is an abstract concept, but we have pleadings in our complaint about what the problems were in the art at the time, how difficult that was, and what, well, at the time actually it was called post-release. Post-release, you'll notice, is in the record in the patent. That was the name of the product. It was rebranded Nativo because of native advertising becoming a term. But anyway, we have pleadings about that this was a difficult challenge. Those were the challenges. We then tie that to the specifications discussing these challenges and then particular claim limitations. In our view, the district court didn't give sufficient credence, well, really any credence to those well-pleaded allegations, and thus for at least on Step 2, we think that the types, the steps that I've been discussing, these are in Claim 13, it's the last five steps at least, plus Claim 22, that we think at minimum provide an inventive concept to get to the extent that it was determined that the claims are simply directed to targeted advertising. With that, I am going to go back to the Step 1 analysis. So we do think it was not routine use of the internet. We think this is a very different use of the internet, like DDR and other cases, and not like custom media either, which is a case about pure targeted advertising, which did just use simple computer tools. Here, we were doing something new. We were using the Disclosed Distributor Module and Press Release Module to dynamically distribute ads to many websites, not static ads, but native ads with multiple components. We think that looking at it that way, it's not an abstract concept. Now, as I said, going back to Step 2, at minimum, we think the last five steps of Claim 13 provide an inventive concept. And under Berkheimer, we think our pleaded allegations must be drawn in our favor. We think that's very clear, and we don't think that they were, and that that precludes judgmental pleadings in this case. Another thing that we pleaded and that we don't think was given enough consideration is the fact that we overcame a one-on-one objection during prosecution. The examiner in that rejection... Can we go back to the complaint, the statements in the complaint? Why are those not conclusory? The answer is, well, those are statements, in our view, of fact, based on the client's knowledge and experience. It's not like... I distinguish those from pleadings where you say, well, you kind of quote the law and say that it's not an abstract concept. It provides inventive concepts. Here, we're explaining exactly what the inventor knew and was doing, the original assignee, and explaining the inventor and the assignee's knowledge. Just to make sure I'm looking at the right page. Yes, Your Honor. Is it pages A75 to A76, just so I make sure I understand? I'm sorry, it actually starts at 73. I want to make sure. Yes, A73 under factual background. There in factual background, you're explaining why there is an inventive concept? Well, we're explaining what the problems were in the art and that they designed Nativo, well, prior post release, ultimately called Nativo, to address those concepts. And then we move from that, then when we go specifically into discussing the law, tying that then to the specification and the claim. We read that all as a continuation, even though in some part it was just some background just for the case, but it is applicable to the patent eligibility of the claims as well. A couple more comments. Two more comments I wanted to say. We did overcome a one-on-one challenge in prosecution. I know that's not just an automatic, but the examiner, I think it's relevant, did raise the very same issues that Rev. Content did and that the judge did. We identified the same sorts of limitations there, and we think those were not given. Can you remind me of the time frame of when that occurred? That occurred in 2014. It was definitely after Alice, 2014 or 2015, when that objection or rejection occurred. Shortly after Alice. Shortly after Alice, besides Alice, when there was a lot of those. Here we think like collective entertainment, our pleaded allegations about what makes the patents inventive mirrored what we said in the patent prosecution, mirrored what the spec says, and therefore we think judgment on the claims was improper. I see I'm getting into my rebuttal time. I think I will save the rest of my time. We will save it for you. Mr. Padmanabhan. Thank you, Your Honor. May it please the Court, Christian Padmanabhan on behalf of Rev. Content, appellees in this matter. Your Honors, we would respectfully request that the Court affirm the judgment on the pleadings of the Court below and find IAL's claims ineligible. I'm going to start by responding to some of what Appellant IAL stated, because I think that will be helpful. He started by explaining what he believes we see every day and how that's different. But that's not what the patent claims say. The patent claims, as this Court has said over and over again, drive the eligibility decision. And if you look to the patent claims, they are directed to the abstract idea of targeted advertising for a web page and formatting the targeted ad in a particular manner with respect to the non-advertising content. As Your Honor said, sort of giving a look and feel or a seamless look and feel. But if you get down to the actual claim limitations, it gets even worse. Because for each of those issues, the actual claim limitations are inherently abstract. So let's start backwards with the look and feel concept. The limitations read such that the sponsored content, which is what they refer to the advertising as, and the non-sponsored content merely need to share a plurality of features. That's it. They have to have something in common. There's nothing more to that. The other thing that IAL said made their claims potentially non-abstract or inventive was that they push the ads out to multiple web pages. Well, let's look at the claim that recites that. And this you can find in Appendix 36. It's Claim 22 of the 622 Patent. That claim simply reads, The method of Claim 13 further comprising electronically posting the sponsored news content among the non-sponsored content at each of multiple related websites and electronically monitoring user data or user activity at each of the multiple websites. It is purely results-oriented. It is simply reciting the results of having the advertising content go out to multiple web pages. Is your point, I hear what you're saying about it being result-oriented, but also, are you also making the point that as far as the claim of a larger scale, the claim is not so, it claims pretty broad. It would cover even a scenario where there are just a couple websites? Absolutely. It's abstract in the nature that it's just essentially, it's abstract and non-inventive. But you can look at the problem as stated in the patent, which they say you would normally need to do this manually and go to a couple of websites. And then they say, well, they automate it. They can go to a plurality of websites. That could be two. So instead of a person going to two websites and pushing the ads out, the system pushes the ads out to two websites. Nothing more than that. I'd like to next go to this idea that they rely on their pleadings, their allegations. If you look at those allegations, they do not help them. They do not help them. I'd actually like to take a moment and go through the allegations, because I think they actually are informative. And you can find these starting at Appendix 73. So paragraphs 8 and 10 are the first ones they start with. And all those say is that the same person that's named inventor founded a company, and the company is doing well. It has nothing to do with the patent claims themselves. In paragraph 9, they talk about the fact that it's difficult to make things look and feel the same way as the non-advertising content on a website. But the claims themselves, all they say, again, in results-oriented fashion, is that the advertising has a plurality of features of the non-advertising content. Nothing more. If you go to paragraphs 15 and 16, which are the next ones they cite to, those are the absolute type of conclusory allegations this Court has cautioned against again and again. They simply just say, we think the claims are eligible, nothing else. And then if you go to paragraph 17 through 21, there they highlight a handful of limitations, all of which were addressed below. And those limitations, they're most clearly called out in paragraph 21. The first is delivering a specific sponsored news content to a particular user, utilizing a particular one of the monitored user data or user activity. That's just targeted advertising. The second is wherein when the sponsored news content is displayed, it is displayed separately from any banner advertisement, and contiguously together with at least some of the non-sponsored content appearing on the page, et cetera, et cetera. This is just formatting on the screen. And the last is electronically posting the sponsored news content among the non-sponsored content at each of the multiple related websites. And that's what we saw in Claim 21 of the 622 patent. It's just the idea of saying, due to multiple, what you did to one before. Nothing other than results-oriented language that they relied on. I would note that in the briefing below to the district court, they did not rely on these allegations to try and get past the 101 motion, rev contents 101 motion. They did not say that the court could not find the claims ineligible based on the pleadings. They relied on the patent examiner issuing a 101, their ability to overcome an objection based on the 101. Your Honor, to your question, that did happen in 2014 and early 2015. How do you respond to their reliance on, say, DDR? Yeah, that's a great question, Your Honor. So in DDR, there was something inventive about it, which was it was a new type of hyperlink, right? The idea was not just common look and feel, but there was something inventive in that hyperlink. The result of that happened to be common look and feel. Here, the claim is written in a fully results-oriented manner. They say we push ads out. We gather data about it. We send the ads to the people. We make them have common features with the non-advertising content on the Web page. Full stop. That's the claim. And that's all of the claims. We'd also note they don't identify any distinguishing limitations amongst the claims, and they did not do so below either with respect to claims other than 1322. I think counsels at this point conceded. Below, they made a large deal of representativeness. At this point, it appears to be conceded. So I think they're agreeing that claims 13 and 22 are representative. The last point in their briefing, I think, is claim construction. They did not argue that below, so it's waived. But on top of that, their proposal with respect to claim construction was plain meaning with respect to all of these terms, and they did not identify any claim term that needed to be construed in order to determine inventiveness or that was determinative of eligibility. And so the district court relied upon that to say claim construction was not necessary. You know, if Your Honors don't have any further questions, I believe I concede my time. Thank you. No one was disappointed by my finishing up all that time. Thank you, Judge. Thank you. Mr. Kimball, next on the roll, please. I'll try to keep it short as well, Your Honors. I wanted to make two points and answer any questions. So with respect to look and feel, there was a question of, well, we don't see what that is. Yes, the claims say a share, a plurality of features. The specification provides examples of that, including, you know, the color of the background, the font, the size in the claim, the continuous nature. Figure 6 shows examples of this. This was discussed in prosecution with respect to overcoming references. So we think while, yes, the claim language allows some room to determine what is a feature, we have described in the specification what is meant by that. And we think that it does, again, as I said before, amongst the other issues, demonstrate an inventive concept. It is not simply formatting on a screen. This is highly difficult to do, again, across websites in a dynamic fashion. With respect to representative claims, we haven't conceded that. I focused on that claim for, you know, purposes of this argument. I would say I think the biggest issue with respect to representativeness is the terms posting versus embedding. Posting in Claim 13, embedding in Claim 8. I think it is of the 781 and in the claims of the 121. That is a term that is in dispute, well, was in dispute in claim construction. And the discussion around that, though the court never heard it because we got the judgment on the pleadings literally the day after we exchanged expert reports, goes to the distinction between those terms. We didn't, we do think they should be given their plenary meaning, but we don't think they have the same meaning as does ref content. And our expert in explaining why they aren't different discusses what that is. So posting with respect to this patent is displaying in the browser for the user. Embedding is a different issue in terms of injecting into the webpage, including through an HTML tag. So there is distinction there. And there is dispute in the claim construction around whether the web server is the one receiving and posting or whether it is the browser. And I think that issues like that go to, back to Judge Stoll's questions, how these inventions, you know, technically were being done. So we think that the judgment was premature in that way on a very, very limited record. We had 220 page briefs, no oral argument, no claim construction. So with that, we would ask the court to reverse. Thank you to both counsel. The case is submitted. And that concludes today's argument.